UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/11/2018_____

MIOSOTIS RIVERA,                                   :
                                                   :
                       Plaintiff,                  :
                                                   :
            -against-                              :
                                                   :
NANCY A. BERRYHILL,                                :
Acting Commissioner, Social Security              :
Administration,                                    :
                                                   :
                       Defendant.                  :
----------------------------------------------------------X

**OPINION AND ORDER**

17-CV-991 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Miosotis Rivera brings this action seeking judicial review of a final decision by Defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying Rivera's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Rivera has moved and the Commissioner has cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the case is remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      BACKGROUND

### A.      Procedural History

Rivera applied for both DIB and SSI benefits on January 14, 2014, alleging a disability onset date of October 25, 2013.  Administrative Record ("AR"), Dkt. No. 14, at 131-43.  On March 4, 2014, the Social Security Administration ("SSA") denied

Rivera's applications. *Id.* at 81-86. On April 23, 2014, Rivera requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 87-88. Appearing with counsel, Rivera testified at a hearing before ALJ Thomas Grabeel on August 3, 2015. *Id.* at 40-58. In a decision dated September 22, 2015, the ALJ found that Rivera was not disabled. *Id.* at 25-34. On October 9, 2015, Rivera requested a review of the ALJ's decision by the SSA Appeals Council. *Id.* at 20-21. On December 30, 2016, the Appeals Council denied Rivera's request, making the ALJ's decision the Commissioner's final determination with respect to Rivera's applications for DIB and SSI. *Id.* at 1-4.

Represented by counsel, Rivera timely commenced this action on February 10, 2017, seeking judicial review of the ALJ's decision under 42 U.S.C. § 405(g) and/or § 1383(c)(3). *See* Complaint ("Compl."), Dkt. No. 1. On August 25, 2017, Rivera moved for judgment on the pleadings. *See* Notice of Motion for Judgment on the Pleadings, Dkt. No. 15; Memorandum of Law in Support of Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 16. The Commissioner cross-moved for judgment on the pleadings on October 24, 2017. *See* Notice of Motion for Judgment on the Pleadings, Dkt. No. 17; Memorandum of Law in Support of Cross Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 18. Neither party filed reply papers. On May 4, 2017, the parties consented to jurisdiction by a United States Magistrate Judge under 28 U.S.C. § 636(c). Dkt. No. 11.[1]

---

[1] This case was previously assigned to Magistrate Judge Barbara C. Moses and was reassigned to me on May 21, 2018.

**B.     The Administrative Record**

**1.     Rivera's Background**

Rivera was born on April 8, 1969 and was 44 years old on the alleged disability onset date.  AR at 131, 135.  She is single and lives in Manhattan with her teenage daughter.  *Id*. at 45, 47, 136.  She also has a son who lives with her mother.  *Id*. at 45, 388.  Rivera did not graduate from high school; her education ended in the eleventh grade.  *Id*. at 45-46.  She worked as a housekeeper from 2008 until 2013, prior to which she had worked as a counselor at the Young Men's Christian Association, in sales for a magazine company, and as a babysitter.  *Id*. at 46, 159.

Rivera has alleged that the following impairments limit her ability to work: depression, panic attacks, insomnia, vomiting, migraines, arthritis in her knees and ankles, and dizzy spells.  *Id* at 158.  Rivera was prescribed various medications to treat her impairments.  *Id*. at 160.  As discussed in the next section of this opinion, Rivera has been diagnosed with major depressive disorder and osteochondroma (an abnormal growth that forms on the surface of a bone) of the knee, and treated by several doctors.  *See, e.g., id*. at 162, 241-42, 252, 323, 327-28, 351, 355, 359-60, 361-64, 366, 369-70, 374, 382, 384, 386-90.  At the hearing before the ALJ, she testified about her depression, anxiety, tearfulness, forgetfulness, dizziness, fear of strangers, and inability to focus, concentrate, and function.  *Id*. at 46-48.  Rivera also testified about her physical conditions, which include heart palpitations,

migraines, headaches, difficulty breathing, and arthritis in her knees and feet. *Id.* at 49-50, 53.

## 2. Medical Evidence and Opinions in the Record

### a. Treatment at Centro Medico Dominicano

Rivera received psychiatric care at Centro Medico Dominicano ("CMD") from Dr. Fernando Taveras, Dr. Yvanka Pachas, and psychotherapist Candida Cartagena from 2013 to 2015 for her major depressive disorder. *See, e.g., id.* at 322-29, 344-48, 356-90, 405-06.

#### i. Treating Physician Dr. Fernando Taveras and Psychotherapist Candida Cartagena

Rivera was first treated by a psychiatrist, Dr. Fernando Taveras, on February 27, 2013. *Id.* at 358. Dr. Taveras found that Rivera demonstrated symptoms of a depressive disorder, including low energy, sadness, difficulty sleeping and concentrating, and increased worrying. *Id.* Dr. Taveras observed that Rivera appeared sad, unhappy, and tearful, and that her body posture, attitude, facial expressions, and general demeanor revealed a depressed mood. *Id.* However, Dr. Taveras also found that Rivera's thinking was logical and that her thought content and cognitive functioning were appropriate. *Id.* Dr. Taveras diagnosed Rivera with major depressive disorder and described it as recurrent, mild, and active. *Id.* at 359. He prescribed medications for her depression and recommended monthly psychotherapy sessions. *Id.*

In a subsequent evaluation on March 14, 2013, Rivera received psychotherapeutic treatment from Dr. Taveras, primarily for depression, but also

for stress management. *Id*. at 360. According to Dr. Taveras, Rivera appeared sad, depressed, and tearful, and her facial expressions and general demeanor revealed a depressed mood. *Id*. He noted that while her affect was mildly constricted, her thought content was appropriate and her thinking was logical. *Id*.

From April 2013 to September 2013, Rivera met with Dr. Taveras for six psychotherapy sessions—two of which were facilitated by psychotherapist Candida Cartagena under Dr. Taveras's supervision. *See id*. at 363-65, 368-70. During most of these sessions, Rivera appeared sad; her facial expressions and general demeanor revealed a depressed mood; and her thought content was noted to be both appropriate but depressed. *Id*. During most of these sessions, however, Rivera was fully communicative; her associations were "intact;" her thinking was logical; and her affect was appropriate. *Id*. During one session, on September 3, Rivera presented no signs of depression and appeared stable. *Id*. at 370.

In 2014, Rivera met with Cartagena under Dr. Taveras's supervision for six additional psychotherapy sessions. *See id*. at 376, 379, 382-83, 387-88. On February 12, 2014, Rivera reported difficulties with remembering, concentrating, and excessive fatigue. *Id*. at 376. During this session, Rivera was counseled to comply with all medical instructions and to take her medication. *Id*. Rivera's mental status exam revealed signs of mild depression, anxiety, and a short attention span, but her affect and thought content appeared appropriate and her associations and thinking were logical. *Id*.

In April, May, June, and September 2014, Rivera revealed no signs of depression, mood elevation, or anxiety. *Id*. at 379, 382-83, 387. However, on October 24, 2014, Rivera appeared sad, tearful, and unhappy. *Id*. at 388. Her facial expressions and general demeanor revealed a depressed mood; her thought content was depressed; and her affect was constricted. *Id*. Rivera reported symptoms of depression and anxiety. *Id*.

In 2015, Rivera met with Cartagena under Dr. Taveras's supervision on two more occasions for psychotherapy sessions. *Id*. at 323, 327. On February 2, 2015, Rivera presented mild signs of anxiety and depressed thought content. *Id*. at 323. Two months later, on April 1, 2015, she presented as mildly depressed, tearful, and unhappy. Her facial expressions and general demeanor revealed a depressed mood; her thought content was depressed; and her affect was constricted. *Id*. at 327.

### ii.    Treating Physician Dr. Yvanka Pachas

Rivera met with another psychiatrist, Dr. Yvanka Pachas, on twelve occasions between 2013 and 2015. *See id*. at 325-26, 328-29, 361, 366, 371-74, 377, 380-81, 384, 389-90. Throughout her treatment, Dr. Pachas recommended psychotherapy and prescribed medications for Rivera's depression. *Id*.

At their first meeting on March 20, 2013, Dr. Pachas found no signs of depression, anxiety, or mood elevation in her examination of Rivera. *Id*. at 228, 361. She noted that Rivera benefitted from medication and individual psychotherapy, and recommended that Rivera continue treatment. *Id*. On May 1, 2013, Rivera appeared sad and tense, and reported depressive symptoms and

excessive worrying. *Id.* at 366. Dr. Pachas observed signs of moderate depression, including depressed thought content and mood, as well as anxiety. *Id.* Dr. Pachas also found that Rivera was easily distracted. *Id.* On October 2, 2013, Dr. Pachas noted that Rivera's condition had improved, but that she still appeared worried and tense, and exhibited symptoms of anxiety. *Id.* at 371. On December 6, 2013, Rivera appeared distracted, anxious, and depressed, and her affect was constricted. *Id.* at 373. However, her thinking was logical and her thought content was appropriate. *Id.*

On January 10, 2014, Dr. Pachas observed that Rivera's condition had improved but that she remained depressed and anxious. *Id.* at 374. On March 19, 2014, Dr. Pachas reported that Rivera's condition had continued to improve but that she remained anxious, depressed, and easily distracted. *Id.* at 377. On March 19, Dr. Pachas increased Rivera's antidepressant medication. *Id.* On May 14, 2014, Rivera appeared upset, anxious, and depressed. *Id.* at 380. Although Rivera's "trembling or shaking" suggested inner tension, restlessness, or anxiety, her associations were "intact," her thinking was logical, and her thought content appeared appropriate. *Id.* Dr. Pachas recommended that Rivera continue individual psychotherapy and medication management. *Id.*

On July 30, 2014, Rivera's conditions had improved. *Id.* at 383. While she exhibited signs of anxiety, her affect, thought content, and cognitive functioning were appropriate. *Id.* On October 31, 2014, Rivera reported feeling depressed and anxious. *Id.* at 389. Dr. Pachas's mental status examination revealed anxiety,

depression, and poor memory. *Id.* On December 12, 2014, Dr. Pachas reported that Rivera was stable under present treatment and had no new emotional complaints. *Id.* at 390. She reported that Rivera's behavior was "under control" and that Rivera had been taking her medication regularly. *Id.*

On February 13, 2015, Dr. Pachas observed that Rivera appeared tense and sad, and that the slowness of her physical movement, her speech, and her thinking revealed a depressed mood. *Id.* at 325. She noted that Rivera exhibited moderate signs of depression and that her affect was constricted. *Id.* On the same day, Dr. Pachas signed a letter stating that she had diagnosed Rivera with major depressive disorder and severe migraine headaches. *Id.* at 406. In her February 13 letter, Dr. Pachas reported that Rivera continued to show the following symptoms: "lack of energy, very tearful, feeling unable to function, difficulty concentrating, irritability, sadness, and forgetfulness." *Id.* She opined that Rivera was "unable to participate in any work-related activities." *Id.*

On April 24, 2015, Dr. Pachas completed a Medical Source Statement indicating that she treated Rivera on a bi-weekly basis for major depressive disorder and migraine headaches. *Id.* at 344. Dr. Pachas identified the following symptoms of Rivera's conditions: poor memory; sleep and mood disturbance; recurrent panic attacks; anhedonia or pervasive loss of interests; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; and generalized persistent anxiety. *Id.* Dr. Pachas described Rivera's reports of "excessive

worrying" and "being tearful most days," and explained that Rivera remains "mildly depressed." *Id*. at 345. Dr. Pachas opined that Rivera's impairments would cause her to be absent from work "more than 3 times a month." *Id*.

Dr. Pachas also opined that Rivera's ability to understand, remember, and carry out instructions was affected by her impairment. *Id*. at 346. She reported that Rivera's ability to respond appropriately to supervision, co-workers, and work pressure in a work setting was affected by her impairment. *Id*. She further indicated that Rivera's deficiencies of concentration, persistence, or pace would result in a failure to complete tasks in a timely manner, and that occasional episodes of deterioration or decompensation in work or work-like settings would cause her to withdraw from situations or to experience exacerbation of symptoms. *Id*. at 347-48.

Dr. Pachas further opined that Rivera had a moderate loss in her ability to perform the following basic mental activities: "remember locations and work-like procedures; understand and remember very short, simple instructions; carry out very short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes." *Id*. at 346-47.[2]

---

[2] According to the Medical Source Statement, "moderate loss" is defined as "some loss of ability in the named activity; can sustain performance for 1/3 up to 2/3 of an 8-hour work day." AR at 345.

Dr. Pachas further opined that Rivera has "marked" difficulties in her ability to perform the following basic mental activities: "maintain attention and concentration for extended periods; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; deal with stress of semi-skilled and skilled work; work in coordination with or proximity to others without being unduly distracted; complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and set realistic goals or make plans independently of others." *Id.*[3]

### b. Treatment at Hemant Patel Physician PLLC

Rivera received medical care from Dr. Sameer Sayeed, Dr. Robert Pyo, and Dr. Mihir Patel at Hemant Patel Physician PLLC from 2014 to 2015. *See id.* at 293-321, 350-55, 444-46, 488-89, 496-97, 640.[4]

On December 18, 2014, December 29, 2014, and March 26, 2015, Rivera met with Dr. Sayeed. *Id.* at 294-96. On December 18, Dr. Sayeed performed cardiovascular stress and echocardiogram tests on Rivera because of her complaints regarding shortness of breath. *Id.* at 496-97. On December 29, Dr. Sayeed

---

[3] According to the Medical Source Statement, "marked loss" is "substantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8 hour workday." AR at 345.

[4] Rivera identified Dr. Pyo as a cardiologist (*id.* at 244), but the record does not contain information about the specialties of Dr. Sayeed and Dr. Patel.

conducted a physical examination of Rivera, assessed her chest pain and shortness of breath, explained her December 18 diagnostic test results, and recommended additional tests and studies. *Id.* at 306-08. On March 26, Dr. Sameer's examination revealed forceful heartbeats and palpitations, suggesting significant anxiety. *Id.* at 294. He prescribed medication for Rivera's anxiety. *Id.* at 296.

On January 13, 2015, Dr. Pyo examined Rivera for shortness of breath and chest pains and discussed the results of her cardiovascular scan. *Id.* at 300, 302. He encouraged Rivera to exercise and lose weight. *Id.* at 302.

On March 18, 2015, Rivera met with Dr. Patel. *Id.* at 444. During this visit, Rivera reported dizziness, weakness, headaches, shortness of breath, knee pain, and allergic rhinitis. *Id.* Dr. Patel prescribed medication for her allergic rhinitis; noted her medications for her various medical conditions; noted her appointment with a cardiologist; referred her to a neurologist for her dizziness; and recommended that she get x-rays for her knee pain. *Id.* at 446. On the same day, Dr. Patel signed a letter stating that Rivera was taking several medications for her major depressive disorder and severe migraine headaches. *Id.* at 640. He opined that she was not able to participate in any work-related activities and exhibited the following symptoms: low energy, tearfulness, irritability, forgetfulness, sadness, difficulty concentrating, and an inability to function. *Id.*

Rivera also met with Dr. Patel on April 21, 2015 and April 29, 2015. *Id.* at 350, 352. On April 21, Rivera reported chest pains, anxiety, heart palpitations, and shortness of breath. *Id.* at 352. Dr. Patel recommended medication for her

palpitations, lifestyle modifications and exercise for her shortness of breath, an orthopedic consultation for her osteochondroma, and continued therapy for her depression. *Id.* at 352-55. On April 29, Rivera reported sharp knee pains that made it difficult for her to bear weight and walk. *Id.* at 350-51. Dr. Patel assessed her osteochondroma and also identified moderate symptoms of depression and anxiety. *Id.* at 351.

### c. SSA Consultative Examiners

In addition to the treating physicians with whom she met frequently, Rivera also met with a number of consultative examiners retained by the Social Security Administration to evaluate her condition.

### i. Dr. Vinod Thukral

On February 20, 2014, Rivera met with internist Dr. Vinod Thukral. *Id.* at 257-61. Rivera reported that she could cook, clean, shop, do laundry, and groom appropriately. *Id.* at 258. Dr. Thukral found no abnormalities in Rivera's physical abilities and opined that Rivera had no limitations sitting, standing, bending, pulling, pushing, lifting, carrying, or any other such related activities. *Id.* at 259-60. Dr. Thukral reported the following diagnoses according to Rivera's medical history: bilateral knee/ankle pain, migraine headache, depression, insomnia, panic disorder, and intermittent dizziness. *Id.* at 260.

### ii. Dr. Michael Kushner

On February 20, 2014, Rivera also met with psychologist Dr. Michael Kushner. *Id.* at 253. Rivera reported difficulties with falling asleep, loss of

appetite, crying spells, social withdrawal, and anxiety-related symptoms, such as a fear of strangers and crowds. *Id.* at 253-54. Dr. Kushner found that Rivera's overall mental presentation was adequate and her appearance was normal and appropriate, but that her recent and remote memory skills were impaired and her cognitive function was below average. *Id.* at 254-55.

Dr. Kushner opined that Rivera was not limited in her ability to follow and understand simple directions and instructions, and perform simple tasks independently; was moderately limited in her ability to maintain attention, concentration, and a regular schedule, learn new tasks, and perform complex tasks under supervision; and was mildly limited in her ability to make appropriate decisions. *Id.* at 255. He also opined that she had moderate to marked limitations in terms of relating adequately with others and appropriately dealing with stress. *Id.* Dr. Kushner further opined that Rivera's difficulties are caused by psychiatric problems and that they may significantly interfere with Rivera's ability to function on a daily basis. *Id.* at 255-56. Dr. Kushner reported that Rivera had anxiety and depressive disorder, migraine headaches, vomiting, arthritis in the knees and ankles, dizzy spells, and "some type of heart arrhythmia." *Id.*

### iii.    Dr. Melody Goldman

On April 13, 2015, Rivera met with psychologist Dr. Melody Goldman. *Id.* at 462. Rivera reported that she was able to dress, bathe, do laundry, and groom, but that her daughter helps her with cooking, cleaning, shopping, and managing money. *Id.* at 465. Dr. Goldman found that Rivera's overall mental status presentation and

13

appearance were appropriate. However, she found Rivera's affect was depressed; her attention, concentration, and recent and remote memory skills were impaired; and her cognitive functioning was below average. *Id*. at 464. Dr. Goldman diagnosed Rivera with major depressive disorder and panic disorder. *Id*. at 466.

Dr. Goldman opined that Rivera was moderately limited in following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, appropriately dealing with stress, and making appropriate decisions. *Id*. at 465. She also opined that Rivera was mildly limited in relating adequately with others. *Id*. She found that the results of Rivera's evaluation were consistent with psychiatric and stress-related problems but that they were not significant enough to interfere with the claimant's ability to function on a daily basis. *Id*.

### iv.   **Dr. Ram Ravi**

On April 13, 2015, Rivera met with internist Dr. Ram Ravi. *Id*. at 472. Dr. Ravi noted the following complaints and diagnoses based on Rivera's medical history: bilateral knee and foot pain, hypertension, diabetes, and cardiac arrhythmia. *Id*. at 475. Rivera reported that she needed her children's help with cooking, cleaning, showering, and doing laundry because of her impairments. *Id*. at 473. Dr. Ravi opined that Rivera had no limitations with sitting and standing, and moderate limitations with bending, pushing, pulling, lifting, and carrying. *Id*. at 475. Dr. Ravi also opined that Rivera should avoid squatting and driving because of

14

her bilateral knee and foot pain, as well as activities requiring mild or greater exertion due to her cardiac condition. *Id.*

### 3. Rivera's Testimony at ALJ Hearing

At the hearing before ALJ Grabeel on August 3, 2015, in Manhattan, Rivera testified and was represented by counsel. *Id.* at 40. The ALJ did not obtain any vocational expert testimony during the hearing.

Rivera testified that she stopped working as a housekeeper in 2013 because of depression, her inability to focus, concentrate, and function, and her family issues and problems. *Id.* at 46. When the ALJ asked her to specify her medical conditions, Rivera responded: "I'm just always very tearful, very depressed. It makes me feel bad that things that I used to do before, I can't do anymore. I always have to have my kids help me to do things. I don't remember things. I'm very forgetful." *Id.* When the ALJ asked if medications help her feel better, Rivera responded: "There's days that I feel a little better." *Id.* at 47. She also testified: "I don't come out of my house . . . I just don't like being around people. I'm very afraid to be near strangers." *Id.* Rivera added that her children help with grocery shopping and cooking because she cannot do it herself. *Id.*

Regarding her physical conditions, Rivera testified: "I have a tumor in my left knee and really bad arthritis . . . in my feet and my knees." *Id.* She also testified about her anxiety, dizziness, shortness of breath, headaches, and migraines. *Id.* at 47-49. She claimed that at times, all of a sudden, her heart "starts beating really really fast." *Id.* at 47-48. She also explained that the lights in her house are always

kept off because of her migraines.  *Id.* at 49-50.  Rivera further testified that she

cannot function, focus or retain things, and that she forgets things often.  *Id.* at 50.

## II.     DISCUSSION

### A.     Standard of Review

#### 1.     Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the

Commissioner in the "district court of the United States for the judicial district in

which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine

whether the Commissioner's final decision applied the correct legal standards and

whether it is supported by substantial evidence.  *Butts v. Barnhart*, 388 F.3d 377,

384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means

such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson

v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations

omitted).

In weighing whether substantial evidence exists to support the

Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting

inferences can be drawn."  *Selian*, 708 F.3d 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"  *Brault,* 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing whether a claimant's impairments meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); 20 C.F.R. § 404.1520.[5] First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the

---

[5] In 2017, new SSA regulations came into effect. The newest regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Rivera's claims were filed in 2014, the Court applies the regulations that were in effect when Rivera's claim was filed. *See, e.g., Rousey v. Comm'r of Soc. Sec.*, No. 16-CV-9500 (HBP), 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *O'Connor v. Berryhill*, No. 14-CV-1101 (AVC), 2017 WL 4387366, at *17 n.38 (D. Conn. Sept. 29, 2017) (same); *Luciano-Norman v. Comm'r of Soc. Sec.*, No. 16-CV-1455 (GTS)(WBC), 2017 WL 4861491, at *3 n.2 (N.D.N.Y. Sept. 11, 2017), *adopted by*, 2017 WL 4857580 (N.D.N.Y. Oct. 25, 2017); *Barca v. Comm'r of Soc. Sec.*, No. 16-CV-187, 2017 WL 3396416, at *8 n.5 (D. Vt. Aug. 8, 2017) (same).

claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the Residual Functional Capacity ("RFC") to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possess the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g., Moran*, 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.    Treating Physician Rule

"'Regardless of its source,' the ALJ must 'evaluate every medical opinion' in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (quoting 20 C.F.R. §§ 404.1527(c), 416.927(c)). A treating physician's opinion receives controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "The regulations define a treating physician as the claimant's 'own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant].'" *Henny v. Comm'r of Soc. Sec.*, No. 15-CV-629 (RA), 2017 WL 1040486, at *9 (S.D.N.Y. Mar. 15, 2017) (quoting 20 C.F.R. § 404.1502). Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "'the treating physician issue[s] opinions that [are] not consistent with other substantial

evidence in the record, such as the opinion of other medical experts,' the treating

physician's opinion 'is not afforded controlling weight.'" *Pena ex rel. E.R.*, 2013 WL

1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)); *see*

*also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion

is with the record as a whole, the less weight it will be given.").

To determine how much weight a treating physician's opinion deserves, the

ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and
> extent of the treatment relationship; (ii) the evidence in
> support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32; *see* 20 C.F.R. § 404.1527(c). If, based on these

considerations, the ALJ declines to give controlling weight to the treating

physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons

for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33;

*accord Snell*, 177 F.3d at 134 (responsibility of determining "the ultimate issue of

disability" does not "exempt administrative decision makers from their obligation

. . . to explain why a treating physician's opinions are not being credited") (citations

omitted). The regulations require that the Commissioner "always give good reasons

in [its] notice of determination or decision for the weight" given to the treating

physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration

in original) (citations omitted). Indeed, "[c]ourts have not hesitated to remand cases

when the Commissioner has not provided 'good reasons.'" *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (alterations omitted).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y. Dec. 3, 2008) (quoting *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."

*Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence the ALJ must consider (in addition to objective medical evidence) are: (1) a claimant's "daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B.  The ALJ's Decision

In a decision dated September 22, 2015, the ALJ concluded that Rivera was not disabled as defined by the Social Security Act. AR at 25. The ALJ reached his decision after following the five-step inquiry. *Id.* at 26-34. At step one, the ALJ determined that Rivera had not engaged in substantial gainful activity since October 25, 2013, the alleged onset date of her disability. *Id.* at 27. At step two, the

ALJ found that Rivera had severe impairments of osteochondroma of the knee and depressive disorder. *Id.* At step three, the ALJ concluded that neither of these impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1. *Id.* at 27-28. The parties do not challenge the ALJ's findings with respect to the first three steps.

At step four, the ALJ made the following finding as to Rivera's RFC:

> [T]he claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a). This includes 6 hours sitting, 2 hours each of walking and standing and lifting and carrying 10 pounds. The claimant is able to perform the mental requirements of the simple unskilled jobs upon which the Medical-Vocational Guidelines were predicated.

*Id.* at 29. The ALJ concluded that while Rivera's impairments "could reasonably be expected to cause some degree of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible." *Id.* In reaching this conclusion, the ALJ determined that Rivera's treatment records indicate the existence of some complaints regarding her physical conditions, but "clinical findings and objective medical testing do not support her allegations." *Id.* In addition, he found that Rivera's psychological treatment records indicate "minimal positive clinical findings." *Id.* at 30.

The ALJ gave "little weight" to treating psychiatrist Dr. Pachas's February 2015 opinion that Rivera was unable to participate in any work-related activities because Dr. Pachas "failed to give specific functional limitations" and "the symptoms noted were not supported by Rivera's mental status examinations." *Id.*

25

at 30.  And while the ALJ afforded "some weight" to Dr. Pachas's April 2015 opinion because she is a treating source, he concluded:

> [T]he specific marked limitations opined are inconsistent with her general conclusions of no more than moderate limitations in functioning.  Furthermore, although she opined to one or two episodes of decompensation, she did not specify if they were of extended duration and there is no supporting evidence in [Rivera's] treatment notes to support this assertion.

*Id.* at 31.  Further, the ALJ found that Rivera's mental status examinations were "essentially normal," and that she was "functioning well in her activities of daily living" even though she was "unhappy about it" and "stressed over family responsibilities."  *Id.*

The ALJ referred to treating psychiatrist Dr. Taveras's medical records from February and March 2013 to conclude that while Rivera made complaints of depression "well before" the alleged onset date of her disability, her mental status examinations were "essentially normal."  *Id.* at 32.  The ALJ explained: "there is no indication that [Rivera's] depression or psychological complaints worsened around her alleged onset date or at any point during the period of alleged disability."  *Id.* He also referred to Dr. Taveras's February 2015 records and found that Rivera's mental status examination was "essentially normal . . . other than depressed thought content and mild signs of anxiety."  *Id.* at 30.

The ALJ gave "little weight" to consultative internist Dr. Thukral's opinion that Rivera had no limitations because "it was based on a one-time examination and it is inconsistent with [Rivera's] treatment records that indicate at least some pain

that would reduce [her] ability to perform exertional activities." *Id*. Similarly, "little weight" was given to consultative psychologist Dr. Kushner's opinion that Rivera had "moderate to marked limitations" because "it was based on a one-time examination and his opinion is inconsistent with [Rivera's] treatment records, which have found substantially normal mental status examinations." *Id*.

The ALJ also gave "little weight" to consultative psychologist Dr. Goldman's opinion that Rivera had moderate limitations because it was "inconsistent with the relatively minimal positive clinical findings . . . and [was] inconsistent with [Rivera's] psychological treatment records." *Id*. at 31. "Some weight" was afforded to consultative internist Dr. Ravi's opinion, but "only so far as it [was] consistent with sedentary work." *Id*. The ALJ found that Dr. Ravi's opinion was based on a one-time examination and "not completely consistent with the minimal findings made in [Rivera's] treatment records." *Id*.

In making his RFC assessment for Rivera, the ALJ found that her daily activities were not limited "to the extent one would expect, given [her] complaints of disabling symptoms and limitations." *Id*. at 32. While he acknowledged that Rivera had received treatment for her allegedly disabling impairments, had taken medications for her depressive disorder, and "undoubtedly experience[d] some limitations resulting from her impairments," the ALJ found that she had not received the type of medical treatment "one would expect for a totally disabled individual," her treatment had been "routine and conservative in nature,"

medications have been "relatively effective" in controlling her symptoms, and there was no indication that she could not perform basic work activities.  *Id.*

At step five, the ALJ concluded that Rivera was not disabled.  *Id.* at 33.  He found that while she is "unable to perform any past relevant work," there are jobs that exist in the national economy that she can perform, considering her age, education, work experience, and residual functional capacity, in conjunction with the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  *Id.* The ALJ did not provide examples of the specific kinds of jobs Rivera could perform in the national economy.

## C.    Analysis

Rivera argues that the ALJ's decision should be "reversed and/or remanded" for a new hearing because: (1) the ALJ erred in finding that Rivera could perform full-time work despite her mental impairment by failing to properly apply the treating physician rule; and (2) the ALJ committed reversible error by failing to obtain vocational expert testimony in light of Rivera's well-documented nonexertional limitations.  Pl. Mem. at 13-24.[6]  The Commissioner disagrees and counters that: (1) the ALJ properly considered the medical opinions and his RFC finding is supported by substantial evidence; and (2) the ALJ correctly found that Rivera could perform work existing in the national economy.  Def. Mem. at 21-24.

---

[6] In her motion, Rivera only contests the ALJ's conclusions regarding her mental impairments and does not address the conclusions regarding her physical impairments.

1. **The ALJ Did Not Comply with the Treating Physician Rule**

Upon review of the record, the Court finds that the ALJ did not comply with the treating physician rule. First, although the ALJ declined to give controlling weight to Dr. Pachas's opinion, he did not provide good reasons or discuss the required factors for discounting her opinion. Second, although the ALJ referred to Dr. Taveras's findings of Rivera's major depressive disorder, he failed to assign any weight to those findings.

   a.   **The ALJ Failed to Provide Good Reasons or Discuss the Required Factors in Declining to Give Controlling Weight to Dr. Pachas's Opinion**

Rivera argues that the ALJ committed legal error by failing to properly weigh the opinion of Rivera's treating psychiatrist Dr. Pachas. Pl. Mem. at 16-21. The Commissioner responds that the ALJ's decision to discount the opinion of Dr. Pachas was proper because it was not supported by, and was inconsistent with, the evidence in the administrative record. Def. Mem. at 21-23.

While he acknowledged that she was a treating physician, the ALJ discounted Dr. Pachas's February 2015 opinion in a mere two sentences, giving her opinion "little weight" because "she failed to give specific functional limitations" and "the symptoms she noted are not supported by [Rivera's] mental status examinations." AR at 30. The ALJ also discounted Dr. Pachas's April 2015 opinion and only afforded it "some weight," finding that her opinion about marked limitations was inconsistent with her general conclusions of no more than moderate limitations, her opinion about Rivera's potential episodes of decompensation were

not supported by Rivera's treatment notes, and Rivera's mental status examinations were "essentially normal." *Id.* at 31.[7]  While the ALJ briefly identified two of the factors that must be considered in his reasoning— specialization and supportability—the ALJ makes no mention of the other factors specified by the regulations and the Second Circuit.[8]

When an ALJ declines to give "controlling weight" to the medical opinions of a treating physician, he must consider various "factors" in deciding how much weight to give the opinions. *See Halloran*, 362 F.3d at 32.  These factors consist of: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the physician is a specialist in the area covering the particular medical issues. *See Burgess*, 537 F.3d at 129 (quoting 20 C.F.R. § 404.1527) (internal quotation marks and alterations omitted).  "If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide 'good reasons' for the weight given to that

---

[7] The ALJ mistakenly referred to Dr. Pachas as a treating psychologist (AR at 31) when the record establishes that she was Rivera's treating psychiatrist (*id.* at 406).

[8] This is hardly the comprehensive analysis that the Second Circuit requires in assessing the weight to be given to a treating physician. *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

opinion." *Garcia v. Comm'r of Soc. Sec.,* No. 15-CV-6544 (GWG), 2016 WL 5369612, at *3 (S.D.N.Y. Sept. 23, 2016) (internal citations omitted).

Notably, in this case the ALJ failed to consider factors such as the length, nature, and extent of the treatment relationship. This failure constitutes reversible error. *See, e.g., Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *20 (S.D.N.Y. June 25, 2014) (ALJ's failure to refer to all factors when explaining weight given to treating psychiatrist's opinion was legal error); *Clark v. Astrue*, No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) ("The ALJ committed legal error by failing to explicitly consider all the required factors."); *Ellington v. Astrue*, 641 F. Supp. 2d 322, 331 (S.D.N.Y. 2009) (remanding in part where "the ALJ made no mention of important factors such as the length and the frequency of the treating relationship"). While the ALJ need not discuss each factor expressly, it should be clear from his decision that he considered each of them. *See, e.g., Camacho v. Colvin*, No. 15-CV-7080 (CM) (DF), 2017 WL 770613, at *22 (S.D.N.Y. Feb. 27, 2017) ("[W]hen an ALJ decides to give less than controlling weight to the opinion of a treating source, the ALJ's consideration of each of those factors must be transparent.") (internal quotation marks omitted).

The failure of the ALJ to consider factors such as the length, nature, and extent of the treatment relationship is especially conspicuous in this case because Dr. Pachas began treating Rivera for depression in March 2013 and saw her at least 12 times before the ALJ issued his decision in September 2015. *See, e.g.,* AR at 325-36, 328-29, 361, 366, 371-74, 377, 380-81, 384, 389-90. Dr. Pachas was likely to

have obtained a longitudinal picture of Rivera's major depressive disorder, indicating that her opinion should have carried significant weight. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."). This is especially true when the physician has been treating the plaintiff for mental health issues. *See, e.g., Rodriguez v. Astrue*, No. 07-CV-534 (WHP) (MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009) ("The mandate of the treating physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental health context.").

The ALJ also failed to proffer good reasons for giving Dr. Pachas's opinion less than controlling weight. In finding that Dr. Pachas's 2015 opinions were not supported by her underlying treatment notes or mental status examinations, the ALJ failed to identify or refer to *any* of Dr. Pachas's medical evidence (including records that documented Rivera's depressive symptoms) in his decision. *See, e.g.,* AR at 325-36, 328-29, 361, 366, 371-74, 377, 380-81, 384, 389-90. Because of this omission, it is not clear whether any of Dr. Pachas's medical evidence was considered in the ALJ's weight determination of her medical opinion.

Given that the ALJ failed to consider all of the relevant factors necessary for discounting a treating physician's opinion and failed to give good reasons for

declining to give Dr. Pachas's opinion controlling weight, the case must be remanded on this basis alone.

###    b.    The ALJ Failed to Assign Any Weight to Dr. Taveras's Findings

According to the record, treating psychiatrist Dr. Taveras and psychotherapist Cartagena treated Rivera for major depressive disorder between February 2013 and April 2015 and met with her more than 20 times for appointments and psychotherapy sessions. *Id.* at 323, 327, 358-60. 363-65, 368-70, 376, 379, 382-83, 387-88.[9]  During his treatment of Rivera, Dr. Taveras conducted mental status examinations, diagnosed her with major depressive disorder, recommended a treatment plan, performed medication management reviews of her medication, and conducted psychotherapeutic treatment. *Id.*  The evidence in the administrative record includes both Rivera's subjective complaints as well as Dr. Taveras's diagnoses and treatments. *Id.*  Accordingly, Dr. Taveras is properly characterized as a treating physician. *See Brickhouse v. Astrue*, 331 F. App'x. 875, 877 (2d Cir. 2009) (noting that a "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]" (quoting 20 C.F.R. § 404.1502)).

---

[9] The record reflects that Dr. Taveras met with Rivera for at least six of the 20 visits. AR at 358-60, 363-65, 368-70.  Throughout the remaining 14 visits, the record indicates that Dr. Taveras was supervising Cartagena's treatment of Rivera. *Id.* at 323, 327, 376, 379, 382-83, 387-88.

In his decision, the ALJ acknowledged in passing that Dr. Taveras was one of Rivera's treating physicians. AR at 30. Nevertheless, despite the substantial amount of medical evidence from Dr. Taveras in the administrative record—more than 20 visits' worth of treatment notes—the ALJ only mentioned Dr. Taveras cursorily (and only once by name) and did not assign any weight to his findings. *Id.* at 30, 32. The ALJ's references to Dr. Taveras are limited to the following: (1) "the record also indicates complaints of depression in February and March 2013, well before [Rivera's] alleged onset date"; however, "the clinical findings made during the February and March 2013 mental status examinations were essentially normal;" (*id.* at 32) and (2) in February 2015, "Dr. Fernando Taveras found an essentially normal mental status examination other than depressed thought content and mild signs of anxiety." (*id.* at 30).

Although the ALJ mentioned a few of Dr. Taveras's findings, his failure to state expressly what weight, if any, he gave to them provides a separate basis for remand. *See, e.g., McClean v. Astrue*, 650 F. Supp. 2d 223, 228 (E.D.N.Y. 2009) (ALJ's failure to weigh findings of a treating physician violates treating physician rule); *Crothers v. Colvin*, No. 13-CV-4060 (VEC) (KNF), 2015 WL 1190167, at *2 (S.D.N.Y. Mar. 16, 2015) (remand where ALJ failed to assign any weight to plaintiff's treating physician's report). "By failing to assign any weight to [Rivera's] treating psychiatrist" and "by implicitly rejecting [his] diagnoses without providing any reasons for doing so, the ALJ committed error that requires remand." *Fontanez*

*v. Colvin*, No. 16-CV-01300 (PKC), 2017 WL 4334127, at *18 (E.D.N.Y. Sept. 28, 2017) (citation omitted).

Here, the ALJ ignored the majority of Dr. Taveras's evidence regarding Rivera's major depressive disorder and failed to assign any evidentiary weight to his findings. Because the ALJ failed to comply with the treating physician rule with respect to Dr. Taveras, the case must be remanded on this basis as well.

### 2. The ALJ Should Reassess Whether He Should Consult a Vocational Expert on Remand

Rivera further contends that at step five of his analysis, the ALJ should have sought the testimony of a vocational expert to "determine whether there is work that an individual with [Rivera's] specific functional limitations could perform." Pl. Mem. at 24. The Commissioner counters that the ALJ properly declined to call a vocational expert because Rivera's "mental condition did not limit her ability to perform unskilled work" and "her nonexertional limitations did not result in an additional loss of work capacity." Def. Mem. at 24. Because the ALJ's findings as to the extent of Rivera's mental limitations were based on an erroneous application of the treating physician rule, the Court does not decide whether the ALJ committed legal error by failing to consult a vocational expert. Instead, the Court directs the ALJ on remand to reassess whether Rivera's nonexertional limitations are significant enough to require consultation with a vocational expert.

"Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered

nonexertional." 20 C.F.R. § 404.1569a(a). When such nonexertional impairments are present, "the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" *Rodriguez v. Colvin*, No. 15-CV-8390 (AJP), 2016 WL 1178780, at *15 (S.D.N.Y. Mar. 25, 2016) (quoting *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986)). Nonetheless, the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines." *Zabala v. Astrue,* 595 F.3d 402, 410-11 (2d Cir. 2010) (citation omitted). Instead, a vocational expert must be called upon where the limitation involved results in "an additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp,* 802 F.2d at 603. Courts will remand where the limitations in question result in marked, or at least moderate, effects. *See, e.g., Baldwin v. Astrue*, No. 07-CV-6958 (RJH) (MHD), 2009 WL 4931363, at *28 (S.D.N.Y. Dec. 21, 2009) (remand where ALJ failed to consult vocational expert despite findings that claimant suffered from "moderate limitations in numerous areas that bear on activities of daily living and social functioning").

At step four, the ALJ concluded that Rivera could "perform the full range of sedentary work . . . includ[ing] 6 hours sitting, 2 hours each of walking and standing and lifting and carrying 10 pounds." AR at 29. He also found that "[Rivera] is able to perform the mental requirements of the simple unskilled jobs upon which the Medical-Vocational Guidelines were predicated." *Id.* At step five, the ALJ found that "considering [Rivera's] age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that [Rivera] can perform." *Id.* at 33. However, the ALJ made his decision based on an improper application of the treating physician rule. After a proper review of the opinion evidence, the ALJ may find that Rivera exhibited at least moderate functional limitations, which may require the ALJ to consult a vocational expert.

Consequently, while it does not determine whether the ALJ erred on the question of reliance on the Medical-Vocational Guidelines here, the Court directs the ALJ to make a renewed determination on this question on remand. *See, e.g., Randolph v. Colvin*, No. 12-CV-8539 (LTS) (JLC), 2014 WL 2938184, at *14 (S.D.N.Y. June 30, 2014), *adopted by*, Order, No. 12-CV-8539, July 23, 2014, Dkt. No. 25 (directing ALJ to revisit the need for vocational testimony after proper review of the record on remand).

## III.  CONCLUSION

For the foregoing reasons, Rivera's motion is granted, the Commissioner's cross-motion is denied, and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should:

1. Provide a comprehensive analysis of the weight afforded to treating psychiatrist Dr. Pachas's opinions based on the factors set forth in the applicable regulations;

2. Consider and weigh treating psychiatrist Dr. Taveras's findings; and

3. Consider, based on his findings after proper application of the treating physician rule, whether Rivera's nonexertional limitations are significant enough to require consultation with a vocational expert.

   **SO ORDERED**.

Dated: New York, New York
   September 11, 2018

_____
JAMES L. COTT
United States Magistrate Judge